Prior to being hired full time, plaintiff was given a physical examination by Charlene H. Freeman, the defendant's nurse, which showed no problems in her hands. Once hired full time, plaintiff was moved from a position as dry filling operator to a wet filling operator. Plaintiff remained a wet filling operator with defendants until she was placed on light duty by defendant employer because of the problems with her hands.
Plaintiff's position as a wet filling operator consisted of three (3) stages: printing bags, filling and plugging bags, and doing roll outs. She remained at each stage about twenty (20) minutes per hour, and that while filling and plugging, she filled approximately twenty-two (22) to twenty-five (25) bags per minute using the same hand and wrist motion each time she filled a bag. This equates to plaintiff using the same hand motion 400 to 500 times per hour or 3500 to 4000 times per shift.
In November 1994 plaintiff experienced some pain in her hands a few weeks after starting her job with the defendants. At that time, she was given splints to wear and advised to wrap her hands like most other employees did. When she began wearing splints and wrapping her hands before work, she did not experience any further problems until March 1995.
After being moved to wet filling operator, she first began experiencing pain, numbness or tingling in her fingers in early March, but did not report this condition to the plant nurse until May 22, 1995. Plaintiff had delayed reporting the condition to the nurse because she thought it would get better, as it had done in November.
Plaintiff continued to work her regular job until she was placed on light duty June 14, 1995 because of the pain and numbness in her hands and finger. In the employer letter of June 14, plaintiff was specifically instructed not to engage in any repetitive motion. She was then sent by the defendants to see Dr. Andrea Stutesman on June 20, 1995 for evaluation of her hand pain and numbness. Dr. Stutesman continued plaintiff on light duty pending the results of nerve conduction studies, which were ordered. The studies were performed on her right hand and showed marked carpal tunnel syndrome.
Dr. Stutesman's initial diagnosis prior to obtaining nerve conduction studies was pectoralis minor syndrome. Following the nerve conduction studies, her diagnosis changed to severe carpal tunnel syndrome and pectoralis minor syndrome. The symptoms of pectoralis minor are the same as those of carpal tunnel, yet it is possible for both to be present at the same time as in this case.
Dr. Stutesman further agreed that plaintiff's position with the defendant may have caused the pectoralis minor syndrome, based on her observations of the job being performed. Although the doctor indicated a simple exercise program would resolve the pectoralis minor, the defendant never offered to provide plaintiff with any treatment associated with this condition. They did however, schedule the plaintiff to have carpal tunnel release surgery performed.
Dr. Stutesman recommended surgery to correct the carpal tunnel and continued plaintiff on light duty work until surgery was completed. Surgery was authorized and scheduled for July 26, 1995, and was to be performed by Dr. Steven Siciliano. On July 24, the surgery was canceled upon discovery that plaintiff was pregnant and upon determination that she was no longer a surgical candidate because of the pregnancy.
According to Dr. Stutesman, plaintiff was no longer a surgical candidate because of the danger surgery presented to the existing fetus. At this time, Dr. Stutesman informed defendant employer that plaintiff could not return to a repetitive motion job until surgery was completed. No further treatment was ever offered to the plaintiff.
Since plaintiff had used up her allotted "modified duty time" but was still restricted to light duty, the defendants forced plaintiff to go out on maternity leave rather than provide her with additional light duty. Plaintiff was on maternity leave as indicated on her attendance record from August 21, 1995 through November 10, 1995 at which time the maternity benefits she had been receiving were stopped. These benefits were paid as evidenced by plaintiff's pay records by direct deposit by defendant to plaintiffs credit union account with defendant's credit union.
On November 1, 1995, plaintiff's maternity physician, Dr. Yeagley, wrote plaintiffs return to work slip stating that she was not restricted from working as a result of her pregnancy. Upon receipt of this information, the defendant contacted Dr. Stutesman, requesting if plaintiff was able to return to work. Dr. Stutesman answered their inquiry in a letter dated November 8, 1995, indicating that Ms. Jones was still unable to return to a repetitive motion job.
Shortly thereafter, plaintiff was advised by defendant that the time period she had been out thus far was not the result of her pregnancy, but rather due to her pre-existing carpal tunnel syndrome. Plaintiff's attendance record reflects this change in that prior to November 11, plaintiff was absent on "ML" or maternity leave. After November 11, plaintiff's attendance record indicates her absence is "SW" or sick without pay.
At this same time, someone from defendant employer, without notice to the plaintiff, withdrew all maternity benefits from plaintiff's credit union account.
After contacting defendant on February 8, 1996, plaintiff was terminated March 13, 1996 with an effective date of February 2, 1996 for being out on medical leave longer than she had been employed with the defendant. However, plaintiff went out on leave on August 14, 1995 and was therefore had not been absent for six months by February 2, 1996.
Plaintiff has retained other employment as of June 6, 1996 working for a telemarketing company, and has been employed since this date. Her current employment does not require any repetitive motion with her hands and have not caused her symptoms to increase. She does continue to have numbness and tingling in her hands and would like to receive further medical treatment.
Decisions of a Deputy Commissioner and the Industrial Commission must be supported by competent evidence contained in the record. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980). In reviewing the findings made by a deputy commissioner, the Full Commission may review, modify, adopt or reject the findings of fact made by the hearing commissioner.Watkins v. Wilmington, 290 N.C. 276, 225 S.E.2d 577 (1976),Godley v. Hackney Sons, 65 N.C. App. 155, 308 S.E.2d 492
(1983).
Carpal tunnel syndrome is considered a compensable occupational disease under N.C. Gen. Stat. § 97-53(13) if it is shown to be (1) causally related to the employment and (2) characteristic of and peculiar to a particular occupation as distinguished from an ordinary disease of life to which the general public is equally exposed outside of the employment.Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189
(1979).
The unchallenged evidence from the plaintiff was that she was performing a highly repetitive motion job with the defendant. She had minor pains in her wrists in November 1994, which resolved. She continued to work with no further complaints until March of 1995. Since the pain had gone away in November, she elected to see if it would go away again. When the symptoms did not go away, she reported her injury to the nurse, who placed her on light duty and sent her to Dr. Stutesman for evaluation. Nerve conduction studies showed she had marked carpal tunnel syndrome. Because of the degree of severity, she was scheduled for right carpal tunnel release surgery. The surgery was subsequently canceled when it was discovered that she was pregnant. At that time, July 24,1995, plaintiff was only a few weeks pregnant. Dr. Stutesman would not allow plaintiff to return to her job because of its repetitive nature and the dangers of aggravating the condition.
The Deputy Commissioner and a majority of the reviewing panel of the Full Commission found that plaintiff's pregnancy was a factor which aggravated her carpal tunnel syndrome. This finding is error. The date the decision of compensability should be based upon is May 22, 1996, when plaintiff was no longer able to perform her job without problems because of her condition, later diagnosed as carpal tunnel syndrome. Plaintiff did not discover she waspregnant until just before her scheduled surgery in July, when shewas only a few weeks pregnant. She was not pregnant when thesymptoms of carpal tunnel syndrome caused her to seek medicalhelp.
Dr. Stutesman testified that any symptoms of carpal tunnel due to pregnancy do not appear in the first trimester but rather the second and third trimester. Therefore, although the pregnancy might cause the carpal tunnel to worsen during the pregnancy, it is highly unlikely the pregnancy aggravated plaintiffs condition prior to May 22, 1996. Dr. Stutesman testified that if carpal tunnel develops as a result of pregnancy, the symptoms will cease once the pregnancy is concluded. She further indicated that she did not believe the pregnancy was a factor in Ms. Jones' condition because she was not pregnant when she began having complaints. The Deputy Commissioner and the majority of the reviewing panel found otherwise, contrary to all evidence presented.
The Deputy Commissioner also found that birth control pills could have aggravated plaintiff's condition. However, Dr. Stutesman opined that there are some people in which this medicine does not exacerbate carpal tunnel. In fact, she admitted it was possible the birth control pills did not affect plaintiff's carpal tunnel at all. Because of these inconsistencies between different people, Dr. Stutesman could not give an opinion regarding birth control as a cause or aggravation of plaintiff's carpal tunnel. Without an opinion to a reasonable degree of medical certainty, the evidence regarding plaintiff's use of birth control and its possible affects should not have been considered and is also error.
Finally, the majority also base their decision on the finding that plaintiff had engaged in a weight lifting program around the same time she first complained about the pain in her hands. Plaintiff testified that her weight training program consisted only of lower body workouts and that she had not performed any weight training on her upper body or upper extremities, because of the problems she was having with her hands at work. The only evidence to contradict the plaintiff are statements made by Dr. Stutesman, who admitted that although plaintiff told her about several specific instances of pain at work, she never related any specific complaints of pain or numbness while weightlifting.
The doctor agreed that if weight training were a cause of the symptoms, plaintiff would have experienced those symptoms while engaging in that activity. Additionally, Dr. Stutesman agreed that she had assumed plaintiff was using the upper body in her weightlifting and that she did not have any notation in her notesor records to indicate what type of weightlifting plaintiff wasdoing. Finally, the doctor agreed that if the plaintiff had not used her upper body in weightlifting, she would no longer be of the opinion that the weightlifting caused plaintiff's condition.
Dr. Stutesman agreed that it was possible for a person to develop carpal tunnel from working the same job as the plaintiff. She further gave her opinion to a reasonable degree of medical certainty that plaintiff's job with the defendant could have aggravated her carpal tunnel syndrome.
The evidence in this case may support a finding that plaintiff's condition pre-existed her employment with defendants. However, the aggravation of a pre-existing condition is a compensable injury under the Workers' Compensation Act. Wilder v.Barbour Boat Works, 84 N.C. App. 188, 352 S.E.2d 690 (1987). Dr. Stutesman testified that in her opinion, based on the severity of her condition, plaintiff most likely had an undiagnosed pre-existing condition of carpal tunnel. She went on to testify that given the degree of nerve damage, the plaintiff's condition was likely aggravated by some factor which occurred between the first complaints in November 1994 and June 1995, when she was diagnosed.
The defendants argue this aggravating factor was either the weight training program, plaintiff's pregnancy, or plaintiff taking birth control medicine. Although these arguments have been specifically addressed above, Dr. Stutesman testified that although it was possible those factors aggravated her condition, plaintiff's job with the defendant also exacerbated plaintiff's existing carpal tunnel. Therefore, even assuming plaintiff did have a preexisting undiagnosed carpal tunnel; her last injurious exposure prior to being diagnosed with carpal tunnel was while she was working for the defendant. The evidence presented clearly demonstrated that plaintiff developed carpal tunnel syndrome as a direct result of the repetitive motion job with the defendant, or in the alternative, had a pre-existing condition which was aggravated by her job with the defendant.
The second requirement for a compensable occupational disease is that the plaintiff's employment placed her at a greater risk of exposure to that condition than the general public. Plaintiff presented evidence of increased risk by showing the frequency of other employees of the defendant in the same position that developed compensable carpal tunnel syndrome.
Dr. Stutesman testified that if evidence was presented which demonstrated a definite correlation between the job plaintiff performed and the development of carpal tunnel in employees performing that job, then she would agree that it was likely that plaintiffs condition was either caused by or aggravated by her job with the defendants. Plaintiff submitted Defendant's answers to plaintiffs discovery requests which demonstrate that 56 employees in the filling operator position over the previous five years had workers' compensation claims as a result of carpal tunnel syndrome which were either admitted as compensable by defendant or determined to be compensable by the Industrial Commission. In other words, it has been conclusively admitted that these 56 cases were caused or exacerbated by the plaintiff's job.
Dr. Stutesman testified that although she has treated three to four thousand (3000-4000) cases of carpal tunnel only 5% of those cases were not work related. By examining the statistics provided 6.63% of the employees working in the same position as plaintiff developed carpal tunnel during the last five years. Compared to Dr. Stutesman's 5% of non-work related cases since 1986. Statistically, this evidence clearly shows an increased risk of developing this condition by plaintiff's job.
When dealing with an occupational disease, determination of compensability is based upon the last injurious exposure. Stattonv Metro Air Conditioning, 117 N.C. App. 226, 450 S.E.2d 550
(1994). "The Industrial Commission has an obligation to make specific findings of fact and conclusions of law determining each issue which is raised by the evidence and upon which plaintiffs right to compensation depends." Id. at p. 553. In the case at bar, the defendants raised the issues that weight lifting, pregnancy, and birth control were aggravating factors of plaintiff's carpal tunnel syndrome. Plaintiff argues that these factors had no impact on plaintiffs condition, and that even if they did have an impact, plaintiff's last injurious exposure was the employment of defendant. With this issue contested before the Commission, there is an obligation on the Commission to decide all matters in controversy between the parties. Id. at p. 553.
The majority failed to make any findings of fact or conclusions of law as to what or when was plaintiff's last injurious exposure. In fact, the evidence presented supports a finding that plaintiff's last injurious exposure was with defendant. The plaintiff testified that she did not engage in weight lifting with her upper body, and she was not pregnant as of May 22, 1996. She further testified that she had been on birth control pills for some time without any symptoms. Given that Dr. Stutesman was assuming plaintiff utilized her upper body in weight lifting, there is no credible evidence to refute plaintiff's testimony. Based upon the evidence presented and Statton v. MetroAir Conditioning, the decision must be reversed.
My vote is to reverse.
This 25th day of August 1998.
 S/ ________________________ THOMAS J. BOLCH COMMISSIONER